[No. B011876. Second Dist., Div. Four. July 23, 1985.]

DOUGLAS V. LONG, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
GEORGE RICKERT et al., Real Parties in Interest.

COUNSEL

Cornwell, Powell & Williamson and Cheryl L. Hackett for Petitioner.

No appearance for Respondent.

James J. Regan for Real Parties in Interest.

## OPINION

**WOODS, P. J.**—Plaintiff sought in an action on a promissory note to recover a purchase money deficiency following defendant's default in the purchase of real property. By petition for writ of mandate, plaintiff seeks to vacate an order that denied his application for prejudgment attachment, on the ground that Code of Civil Procedure section 580b bars recovery of the purchase money deficiency. Plaintiff's subordinated purchase-money second deed of trust was rendered valueless when defendant purchaser defaulted and the subordinating construction loan trust deed was foreclosed upon.

■  The determinative issue is whether the circumstances of the underlying subordinated purchase-money security transaction are such as to constitute a "variation" of the "standard" real property purchase money security transaction (*Brown* v. *Jensen* (1953) 41 Cal.2d 193 [259 P.2d 425]) that is recognized in *Spangler* v. *Memel* (1972) 7 Cal.3d 603 [102 Cal.Rptr. 807, 498 P.2d 1055], to be exempt from application of the antideficiency bar of section 580b.

Defendants successfully contended below that their secured sale transaction is materially distinguishable from that in *Spangler, supra,* because plaintiff obtained a proportionately larger downpayment than the *Spangler* seller, thus minimizing his loss if the section 580b bar applies, and also "participated" in and "assumed the risk of" defendant's development of the property with condominiums.

Comparison of the facts of this case with those of *Spangler* in light of the explicit *Spangler* rationale requires the conclusion that plaintiff's security transaction is not materially distinguishable from that in *Spangler* and is thus not subject to section 580b.

The facts are not in dispute.

In 1979 plaintiff was the owner of a parcel of real property improved with only a single family home which he used as a residence and an office. The value of the property was approximately $150,000. Plaintiff investigated the condominium market and determined to sell the property for $250,000 on the basis of its development value for the construction of five condominiums. Plaintiff located defendant, a builder of condominiums, through a broker. In March 1980 defendant purchased the property for $252,000 with a $134,000 downpayment and plaintiff took back a promissory note for the balance, secured by deed of trust. Plaintiff subordinated his deed of trust to a bank's construction loan deed of trust in the amount of $682,000. The balance due plaintiff under the promissory note was to be paid over three years, with monthly payments of $1,223 on accruing interest (at 12 percent per annum) and a balloon payment at the end of the third year. However, this payment schedule was to be accelerated upon defendant's sale of each of the five condominiums, in that defendant would payoff one-fifth of the "loan" and plaintiff's deed of trust encumbrance would be accordingly reduced.

After defendant completed construction in 1982, he was unable to sell the completed units. In August 1982, the senior trust deed was foreclosed upon by the construction lender and plaintiff's subordinated deed of trust was rendered valueless.

In December 1984, plaintiff filed his underlying action to recover the balance due under his promissory note. In January 1985, he filed his application for a right to attach order affecting two other parcels of real property owned by defendant. Plaintiff's application was supported by the purchase documents, including the escrow instructions, promissory note, the senior and junior deeds of trust, and the grant deed. Plaintiff contended that the circumstances of his transaction was the same sort of "variation" from the

"standard" purchase-money security transaction as was involved in *Spangler* and that section 580b was thus inapplicable to bar his recovery of the deficiency.

In opposition to plaintiff's application, defendant submitted his declaration stating that he purchased the property with the intent to raze the existing house thereon and to construct five condominiums for resale. He attributes his inability to sell the completed units to "high interest rates" as of "early 1982."

Defendant also submitted the declaration of the real estate broker, Roger Miller, who had located defendant as the purchaser. Miller stated that plaintiff had told him of his investigation of the potential condominium market for his property and his wish to sell it for $250,000 on the basis that five condominiums could be constructed thereon and the property would be worth about $50,000 per unit to a developer. Plaintiff gave Miller a document that listed the "terms of sale" proposed by plaintiff. Plaintiff's "terms of sale" prospectus contained a provision (#12) stating that he was "to receive 2% . . . of the selling price of each condo, due and payable upon the close of the condo sale." The record does not contain any testimony nor documentary evidence indicating that this proposed two percent of condominium sale price provision was made a part of the eventual purchase contract between plaintiff and defendant.

Miller was told by plaintiff prior to the sale that plaintiff ". . . was aware that if the project bombs out, he would lose his money carried back." Miller located defendant as a purchaser for plaintiff's property, after having seen a completed "large and well designed condominium project" which defendant had built. Miller advised him of plaintiff's property and defendant prepared an offer to purchase the property.

Respondent denied plaintiff's application for attachment. We do not have the reporter's transcript, but the March 4 minute order states: "*Spangler* v. *Memel* 7 Cal.3d 603 is not applicable to this case since the facts are significantly different. [¶] Here plaintiff Long's conditions of sale substantially protected him since the cash downpayment of $134,000 almost equalled the intrinsic value of the property ($150,000). Moreover, Long actively participated in the project and knowingly assumed the risk."

Plaintiff filed his petition for writ on March 15, 1985, and we issued the alternative writ.

## I

To analyze whether the purchase money security transaction here is materially distinguishable from that found in *Spangler,* and thus not subject to

the general antideficiency proscription of section 580b recognized in *Brown* v. *Jensen, supra,* 41 Cal.2d 193, it is necessary to set forth the general rule of applicability of section 580b and to review in detail the circumstances and rationale of *Spangler.*

In *Brown* v. *Jensen, supra,* 41 Cal.2d 193, the Supreme Court construed the antideficiency proscription of section 580b to apply to "any" seller of real property who takes a purchase money deed of trust or mortgage to secure payment of the purchase price. The specific holding of *Brown* is that section 580b applies to a seller whose subordinated purchase money deed of trust is not itself foreclosed but is rendered valueless by foreclosure on the senior deed of trust held by an institutional lender that loaned the buyer part of the purchase price.

In *Spangler* v. *Memel, supra,* 7 Cal.3d at page 614, the Supreme Court recognized an exception to the general application of section 580b, holding "that when in the sale of real property for commercial development, the vendor pursuant to the agreement of sale, subordinates his purchase money lien to the lien securing the purchaser-developer's construction loan and thereafter, upon the default of the purchaser-developer, loses his security interest after sale or foreclosure under the senior lien, section 580b should not be applied to bar recovery by the junior vendor lienor of the unpaid balance of the purchase price of the property."

In *Spangler,* the seller marketed real property that she had purchased in 1956 for $43,000. It was improved with a single family residence and zoned for commercial use. Seller decided to attempt to realize the property's appreciated value "in view of the possibility of erecting a commercial office building upon the site." In 1961 the property was purchased for development purposes for $90,000 with a $26,100 downpayment and a promissory note for $63,900 secured by a purchase money deed of trust, which was to be subordinated to construction loans up to the amount of $2 million. Seller contracted for the partners of the purchasing partnership to execute personal guarantees and waivers of their protection from deficiency judgments in consideration for seller subordinating her security to construction loan deeds of trust. A construction loan in the amount of $408,000 was obtained by buyer and seller's purchase money deed of trust was subordinated thereto. After buyer constructed the contemplated commercial office building the project failed, "despite the diligent efforts of [buyer] to obtain tenants," ". . . due to higher costs than expected, because the building was noncompetitive in attracting tenants as compared to other new office buildings in the area, due to the inability to obtain a take-out loan when the Union Bank loan became due and because of the failure to sell the building." (*Id.,* at

pp. 606-607.) Union Bank brought action to foreclose on its defaulted senior deed of trust.

The *Spangler* court determined that the antideficiency proscription of section 580b, established in *Brown* v. *Jensen, supra,* 41 Cal.2d at page 198, remains in full effect but "applies automatically only to the standard purchase money situation." If the purchase money security transaction is a variation of the standard, then application of section 580b turns upon whether such application would serve the recognized purposes of that statute. (*Spangler, supra,* 7 Cal.3d 603 at p. 611)[1]

The *Spangler* court attributed two purposes to section 580b, which the court had previously described in *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 42 [27 Cal.Rptr. 873, 378 P.2d 97]: "Section 580b places the risk of inadequate security on the purchase money mortgagee. A vendor is thus discouraged from overvaluing the security. Precarious land promotion schemes are discouraged, for the security value of the land gives purchasers a clue as to its true market value. [Citation.] If inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability. Section 580b thus serves as a stabilizing factor in land sales." (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 612.)

Given the nature of the "standard transaction" subject to section 580b and the purposes attributed to that statute, the *Spangler* court determined that the transaction before it was a significant variation and was not subject to the automatic application of section 580b: "In the standard transaction the vendor usually sells the property to a purchaser who is going to continue the same or similar use of the property. The present security value of the property, therefore, is a reliable indicator of its actual fair market value. However, in the situation where the vendor agrees to subordinate his lien to the purchaser's construction loan, the purchaser does not intend to continue with the same use of the property but actually intends a different use which contemplates considerable improvement of it. In this latter situation, the present security value of the property, therefore, is *not* a reliable indicator of the ultimate value of the property; that value will be determined by the success of the venture which contemplates a *change* in the use of the

---

[1]Section 580b was viewed by the court as being directed only to situations where the buyer either gives the seller a secured note for the purchase price balance or gives a note and senior deed of trust to a third party who lends buyer a portion of the purchase price. Most significantly, the buyer continues to use the property in substantially the same manner as the seller had. (See *Spangler* v. *Memel, supra,* 7 Cal.3d at pp. 611-612; *Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d at p. 41.)

property." (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 611; italics in original.)

Turning finally to the determination of whether the construction loan subordination transaction should be subject to section 580b, the *Spangler* court determined that neither purpose attributed to the statute would be served by its application. The court reasoned: "If in such situation section 580b is applied to prevent the vendor from suing on his promissory note, after the development has failed and the senior lienor has caused the property to be sold, the risk of the failure of the commercial development is thrust upon the vendor. In fact, however, the success of the commercial development depends upon the competence, diligence and good faith of the developing purchaser. It would seem proper, therefore, that the purchaser not the vendor bear the risk of failure, particularly since in the event of default, the junior lienor vendor will lose both the land and the purchase price.

"In this factual context, the security value of the property at the time of the sale, which in *Roseleaf* we found to be at once an indicator of market value and a significant factor in deterring overvaluation by the vendor, gives no clue to market value, since the sale contemplates radical improved and changed use of the property. Effective prevention of overvaluation in a sale of property for commercial development utilizing a subordination clause lies in forcing the purchaser-developer to make realistic assessments of the likelihood of the project's success and in inducing him to exert his highest efforts in carrying it out. We think this can be accomplished by placing the risk of failure upon the purchaser-developer where it in reality belongs, by permitting the sold-out junior lienor vendor to recover a deficiency judgment in an action on his promissory note. We are of the opinion that the purpose of preventing overvaluation in this context is best subserved by not applying section 580b." (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 613.)

An additional consideration was cited by the court as requiring abeyance of section 580b in the subordinating construction loan context. It pointed out that the amount of the construction loan is usually "extremely large" in proportion to the preconstruction property value. The typical seller thus cannot raise the "astronomical sums needed to buy in at the senior sale and thereby protect his junior security interest. The only possible protection available to the vendor other than careful and sometimes fortuitous choice of purchasers, is to allow a deficiency judgment against the commercial developer." (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 614.) The court pointed to the 1963 amendment to section 580b—creating additional deficiency protection for purchasers of single-dwelling residential property (housing not more than four families) against purchase money lender deeds of trust—as evidencing the Legislative intent to treat commercial developers

differently in determining the applicability of section 580b. (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 614, fn. 8.)

The court further determined that the second purpose of section 580b would not be served in the context of a subordinating construction loan: "The second purpose delineated in *Roseleaf,* namely to prevent aggravation of a depression in land values by not burdening purchasers with loss of the property plus personal liability, has little applicability to a sold-out junior lienor in the subordination clause context. If section 580b is applied to prevent the deficiency judgment, then the subordinating sold-out junior lienor loses both the land and the purchase price. If section 580b is not applied then the purchaser is subjected to the same burden. Neither party has the land in this context; the sole question is who shall bear the cost of the unpaid portion of the purchase price." (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 614.)

It is clear that the broadly stated *Spangler* exception for purchase money transactions involving subordinating construction loan deeds of trust is founded upon a rationale that encompasses the case before us. However, defendant asserts several factual distinctions as reasons for application of section 580b. Each such contention will be addressed.

Defendant's primary contention appears to be that because plaintiff obtained a downpayment that nearly equaled the predevelopment value of the property, plaintiff is not in the same "equity" position as the seller in *Spangler* who received less than 50 percent of the preconstruction property value by downpayment.

However, the *Spangler* rationale is explicit in placing the full risk of the failure of the development project upon the purchaser/developer. *Spangler* did not in any manner intimate that the seller should be the insurer of the buyer's risk venture if the seller comes close to recovering the predevelopment value of the property before his security is wiped-out by foreclosure on the construction loan. The pivotal criterion is that the radical change in use and value contemplated by the buyer, at once renders the security value of the subordinated purchase money security uncertain. It also significantly jeopardizes the integrity of the purchase money security by imposing the potential of a noncurable senior deed of trust foreclosure by the construction lender. *Spangler* addresses the question as one of providing the benefit of the bargain and assignment of full risk, not as a mediating of respective losses.

Defendant next contends that because plaintiff was a "financial broker" and investigated the potential property value for condominium construction

and expressed to the broker a belief that he could not obtain the purchase price balance if the development project failed, plaintiff is in a materially different security position than the *Spangler* seller who attempted to obtain personal guarantees and waivers of section 580b protection from the purchasers.

The record demonstrates, however, that plaintiff took no risk material under the *Spangler* analysis beyond that taken by the seller in *Spangler*. Plaintiff, like Mrs. Spangler, prudently attempted to realize maximum value from his property based upon its value for development. After the sale, both plaintiff and Mrs. Spangler were relegated to reliance upon their respective buyers to perform successfully and fully pay the purchase balance.

There is no competent evidence in the record indicating that plaintiff's expression of a belief as to his security position was intended as a formal waiver of any deficiency recovery or that the purchase contract contained any such provision. Defendant cites no authority for the proposition that a seller's subjective mistaken belief as to his rights under the law may constitute a formal or de facto waiver of his true rights. There is no evidence that plaintiff intended or expected that his comment to Mr. Miller be transmitted to defendant as a waiver of plaintiff's potential deficiency rights. Neither is there any claim by defendant that he heard or detrimentally relied upon any such communication.

Defendant contended below, and respondent stated as a basis for its ruling, that plaintiff ". . . actively participated in the project and knowingly assumed the risk."

It appears that defendant refers to the payment schedule on the purchase money promissory note providing for accelerated payment of "⅕ of the loan" each time one of the condominiums was sold. This is not active participation in the development project or its profits but merely a pro rata payment schedule that provides plaintiff with no additional profit. It also had potential benefit to defendant in allowing early retirement of the note obligation and avoidance of interest accruing on the unpaid principal balance for the full three-year term. The record does not contain any evidence supporting the claim that plaintiff "knowingly assumed the risk" in any materially greater sense than did the seller in *Spangler*.

Defendant's claim that the property was in fact overvalued is in conflict with the claim that plaintiff investigated the market and believed that the property would be worth $50,000 per unit to a condominium developer. There is no competent evidence on the record supporting the conclusionary claim of overvaluation.

Defendant also argues, in effect, that because the "overevaluation prevention" purpose attributed to section 580b by the Supreme Court has been criticized as wholly ineffectual (*Budget Realty, Inc.* v. *Hunter* (1984) 157 Cal.App.3d 511, 515-516 [204 Cal.Rptr. 48]), we should not apply the *Spangler* exception. This case is not materially distinguishable from *Spangler*, and we are bound by that decision. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Further, *Spangler* points out that in these construction situations, senior deeds of trust are usually so enormous as to preclude the seller from protecting his junior security interest, and this is an independently compelling basis for treating these transactions differently. (See *Budget Realty, Inc.* v. *Hunter, supra,* 57 Cal.App.3d 511, 516.)

We must also reject the contention that because the secondary purpose of section 580b is to prevent aggravation of a decline in property values in "a general or local depression" it is appropriate to protect defendant here when his default was caused by high interest rates that narrowed the class of persons who could buy his condominiums.

First, *Spangler* squarely rejects the applicability of this purpose in the context of subordinating construction loan foreclosures.

Second, defendant's argument misconceives the original meaning of "a decline in property values during a general or local depression." Section 580b was enacted by statute in 1933 and reenacted in 1935 when the drastic effects of the great economic depression of that period had a devastating effect upon real property values. There is no evidence in the record demonstrating that a depression existed in 1980 through 1982 of the nature apparently contemplated by section 580b. The Supreme Court's reference in *Spangler,* at page 612, and in *Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d at page 42, is to depressions that result in depressed property prices, not merely to the condition of high interest rates or over-building of condominiums retarding the sale of certain types of property. Under any standard, there is not substantial evidence on the record to even establish that in 1982 a depression caused plummeting property prices in general and that real property defaults aggravated a depression cycle.

Finally, defendant's contention that plaintiff necessarily assumed the risk of foreclosure on the construction loan because such loan was necessary to his obtaining the high sale price is wholly refuted by the fact that the seller in *Spangler* assumed the same risk for the same reason.

Let a peremptory writ of mandate issue directing respondent to vacate its order of March 4, 1985, in Los Angeles Superior Court case No. SWC

76149, entitled Douglas V. Long v. George Rickert et al., and to make a new and different order granting plaintiff's application for right to attach order and writ of attachment.

McClosky, J., and Arguelles, J., concurred.

A petition for a rehearing was denied August 6, 1985, and the petition of real parties in interest for review by the Supreme Court was denied October 2, 1985.