[No. A025128. First Dist., Div. Three. Mar. 27, 1986.]

JOHN P. ROFFINELLA et al., Cross-complainants and Respondents, v. GEORGE SHERINIAN et al., Cross-defendants and Appellants.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II B and II C.

COUNSEL

Hetland & Hansen, John R. Hetland, Charles A. Hansen, Rose & Kornhauser, M. Fred Rose, Samuel Kornhauser and Frederick Hertz for Cross-defendants and Appellants.

Siegfried Hesse, E. Elizabeth Summers, Wald, Knoll, Freedman, Chapman & Bendes and Charles Bendes for Cross-complainants and Respondents.

OPINION

**BARRY-DEAL, J.**—Cross-defendants George Sherinian, Angelo Canepa, Joseph Anzalone, Dominick Anzalone, and SAC Properties (SAC), a part-

nership (appellants) appeal from a judgment awarding cross-complainants John P. Roffinella and Nancy J. Roffinella (respondents) over $360,000 on their cross-complaint for money due on a promissory note. The court, sitting without a jury, found appellants personally liable for a deficiency caused when a senior lienholder foreclosed on the property which appellants had purchased from respondents. Appellants argue that as a matter of law they are protected against personal liability by Code of Civil Procedure section 580b[1] and that the trial court erred in applying the exception to the antideficiency provisions of section 580b announced in *Spangler* v. *Memel* (1972) 7 Cal.3d 603 [102 Cal.Rptr. 807, 498 P.2d 1055]. They also appeal from certain portions of the award, including the award of attorney's fees. We conclude that the facts of this case bring it within the *Spangler* exception and affirm the judgment.

## I. *Background*

Respondents owned real property, consisting of residential and commercial rental units, near downtown Santa Cruz. An attempt at developing the property for senior citizen housing failed, and vandals effectively made the buildings uninhabitable. Respondents sought to sell the property.

In December 1976 or January 1977, John Panattoni, a real estate broker, inquired as to the property's availability. He subsequently told respondents that a group was interested in purchasing it. On February 8, 1977, Panattoni and Sherinian, an attorney, met respondents in respondents' San Diego home and presented respondents with an offer to purchase the property. The offer, entitled "Real Estate Purchase Contract and Receipt for Deposit," was drafted by Panattoni without any input from respondents. It called for a purchase price of $390,000, to be paid $112,000 in cash and the $278,000 balance by a note to respondents secured by a first deed of trust on the property. The offer also contained the following provisions: "Seller to Subordinate above mortgage in escrow to Construction Loan." The same day, respondents made a counteroffer changing some of the terms of the promissory note not relevant to our discussion, and the resulting agreement of sale was signed that evening.

Appellants testified that at the time they purchased the property they did not know precisely what they were going to do with it. However, they had contemplated developing it. Respondent John Roffinella testified that at the San Diego meeting, Sherinian mentioned that the subordination clause was in the contract to permit development of the property. Sherinian denied

---

[1]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

requesting the subordination clause and stated he had never discussed such a clause with respondents.

On March 10, 1977, respondents signed sellers' escrow instructions which included the statement, "Sellers herein agree to subordinate to a construction loan at a later date." Respondents did not request the title company to include that provision and assumed that the title company had inserted it as part of the original agreement. The buyers' instructions did not include a subordination clause. Escrow closed shortly thereafter. Neither the deed nor the deed of trust contained the subordination clause.

In May 1977, appellants discussed the possibility of developing the property with Security Pacific National Bank (Security).[2] By the summer of 1977, the development was in the planning stage, but another year passed before the city approved the project. Nonetheless, Security began disbursing funds for the development in December 1977.

SAC was continually late in its payments on the note to respondents. On August 22, 1978, Sherinian wrote John Roffinella, promising to catch up on the past due interest payments and thanking him for his patience. Although respondents could have foreclosed on the property, they decided to give appellants time to put the deal together.

In late September 1978, Sherinian telephoned Robert Freedman, respondents' attorney, to say that SAC was ready to obtain the construction loan and that SAC needed a subordination agreement from respondents.[3] Sherinian and Freedman negotiated an agreement by which SAC obtained a six-month moratorium on payments to respondents and a schedule releasing each unit from respondents' lien as it was sold. The maturity of the SAC note to respondents was shortened from 1985 to 1980, and respondents were paid $1,100. These terms were incorporated into a "Subordination Agreement" dated October 13, 1978, and recorded November 8, 1978. A $4,572,800 construction loan from Security was formalized on October 19, 1978. The condominium project was completed in May 1980.

The agreement regarding subordination required that respondents be paid in full by October 1, 1980. By late summer 1980, respondent John Roffinella

[2]Although Sherinian did not recall discussing with the banker that condominiums would be erected on the site or that respondents would subordinate their interest to any future construction loan, an internal bank communication from the banker, Charles J. Brenner, noted that appellants intended to build 65 condominiums on the property and that respondents would subordinate to any future construction loan.

[3]Sherinian testified that he never told Freedman that a subordination agreement was required.

needed $150,000 to satisfy debts arising out of his dental practice. Realizing from ongoing conversations with Sherinian that he would not be paid on time, Roffinella telephoned Sherinian in August or September 1980 to inquire if any of appellants could advance the needed funds. Sherinian told Roffinella that he did not have the money, but later agreed to pay "all costs" if Roffinella borrowed the sum. Roffinella understood "all costs" to mean everything owing above principal. Sherinian testified that he understood the agreement to include only loan fees and points.

On November 7, 1980, respondents borrowed $159,205 from the Bank of San Marino. Respondents gave the bank a note secured by an assignment of the subordinated deed of trust executed by SAC on the Santa Cruz property. The note became due on May 7, 1981.

In May 1981, respondents learned that a notice of default on SAC's note to Security had been recorded by Security.[4] Throughout the summer of 1981, appellants insisted that they would avoid foreclosure; however, on September 29, 1981, the property was sold at foreclosure for $4,853,491.94, the amount owing to the bank. Respondents did not foreclose on their subordinated note because they lacked the money to pay Security.

On March 16, 1982, the Bank of San Marino sued respondents for the balance due on its note, $116,907.53, plus interest, costs, and attorney's fees. Respondents cross-complained against appellants for the balance due on the SAC note. The cross-complaint contained five causes of action: the first sought recovery based on the original note; the second was for breach of the agreement regarding subordination; the third sought recovery pursuant to the agreement that appellants would pay all costs in connection with respondents' loan; the fourth was for fraud; and the fifth sought declaratory relief. Respondents subsequently settled with the Federal Deposit Insurance Corporation (FDIC), receiver for the Bank of San Marino, and judgment was entered in favor of the FDIC for $150,942.56 plus costs.

Following a court trial on the cross-complaint, judgment was entered in favor of respondents[5] for $322,709.96. In its memorandum of decision, the court concluded that the transaction between appellants and respondents was governed by *Spangler* v. *Memel, supra,* 7 Cal.3d 603, which provides for an exception to the antideficiency provisions of section 580b. Appellants requested no statement of decision.

[4]The notice of default recorded on May 12, 1981, was the third such notice recorded. Respondents, however, never received notice of the first two notices of default.

[5]Appellants' motion for a directed verdict was granted as to respondents' fraud and declaratory relief claims.

After a subsequent hearing, respondents were awarded $38,128.70 in costs, including $35,000 in attorney's fees pursuant to Civil Code section 1717. This appeal followed.

## II. *Discussion*

■ A judgment of the lower court is presumed correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 268, p. 276.) Where no statement of decision is requested, it must be presumed that the trial court found facts necessary to support the judgment. (Cf. *Stewart* v. *Langer* (1935) 9 Cal.App.2d 60, 61 [48 P.2d 758]; see also *Bank of Costa Mesa* v. *Losack* (1977) 74 Cal.App.3d 287, 291 [141 Cal.Rptr. 550].)

### A. *Applicability of Spangler to the Facts of the Instant Case*

■ The determinative issue in this case is whether the circumstances of the underlying subordinated purchase money security transaction constitute a variation of the standard purchase money security transaction. (*Long* v. *Superior Court* (1985) 170 Cal.App.3d 499, 500 [216 Cal.Rptr. 337].) Variations of the standard transaction may be exempt from the application of the antideficiency provisions of section 580b. (*Spangler* v. *Memel, supra,* 7 Cal.3d 603, 611, 614; see 3 Witkin, Summary of Cal. Law (8th ed. 1973) Security Transactions in Real Property, § 123, pp. 1592-1593.)

Section 580b provides, in pertinent part: "No deficiency judgment shall lie . . . after any sale of real property for failure of the purchaser to complete his [or her] contract of sale, or under a deed of trust, or mortgage, given to the vendor to secure payment of the balance of the purchase price of real property . . . ." In *Brown* v. *Jensen* (1953) 41 Cal.2d 193 [259 P.2d 425], the Supreme Court held that section 580b applied to all sellers of real property who take a purchase money deed of trust or mortgage to secure payment of the purchase price. (*Long* v. *Superior Court, supra,* 170 Cal.App.3d 499, 503.) The court specifically determined that section 580b applied to a seller whose junior deed of trust was rendered valueless by foreclosure of a senior lienholder. (*Brown* v. *Jensen, supra,* 41 Cal.2d at pp. 196-197; see also *Spangler* v. *Memel, supra,* 7 Cal.3d 603, 609.)

The Supreme Court in *Spangler* recognized an exception to the general application of section 580b, concluding "that when in the sale of real property for commercial development, the vendor pursuant to the agreement of sale, subordinates his [or her] purchase money lien to the lien securing the purchaser-developer's construction loan and thereafter, upon the default of

the purchaser-developer, loses his [or her] security interest after sale or foreclosure under the senior lien, section 580b should not be applied to bar recovery by the junior vendor lienor of the unpaid balance of the purchase price of the property." (*Spangler* v. *Memel, supra,* 7 Cal.3d 603, 614, fn. omitted.)

In *Spangler,* cross-complainant seller marketed real property that had been purchased in 1956 for $43,000. The lot was improved with a single-family house and was zoned for commercial use. The seller decided to take advantage of the property's potential for commercial development and sold it in 1961 for $90,000. The seller received $26,100 in cash plus a promissory note for $63,900 secured by a purchase money deed of trust which was to be subordinated to construction loans up to $2 million. The purchasers, upon the seller's demand, executed personal guarantees and waivers of their protection from deficiency judgments in consideration for the seller subordinating her security to the construction loan. The buyers obtained a $408,000 construction loan to erect an office building, and the seller's security was subordinated thereto more than one year after the original sale. The building was completed, but the project failed, despite diligent efforts by the buyers to obtain tenants. The failure resulted from higher costs than expected; other new buildings were more attractive to tenants, the buyers could not obtain a take-out loan when the bank loan became due, and they were unable to sell the building. The bank foreclosed, and the seller's security was rendered worthless. (*Id.,* at pp. 605-607.)

The *Spangler* court reaffirmed its ruling in *Brown* v. *Jensen, supra,* 41 Cal.2d 193, that section 580b applied to sold-out junior lienholders holding a purchase money mortgage or deed of trust, but pointed out that the rule applied automatically only to the standard purchase money situation. The court concluded that the transaction in question was a variation on the standard transaction, and that section 580b was not applicable. (*Spangler* v. *Memel, supra,* 7 Cal.3d 603, 610-612, 615.) It reasoned that in the standard transaction, the purchaser plans to make the same or similar use of the property, and that therefore the present security value of the property is a reliable indicator of its actual fair market value. (*Id.,* at p. 611.) However, where the purchaser intends a different use of the property which contemplates considerable improvement of it, the value will be determined by the success of the venture. (*Ibid.*) In this situation, the purchaser and not the seller should bear the risk of failure. (*Id.,* at p. 613.) Moreover, construction loans are generally so large that a typical seller cannot raise the sums needed to buy in at the senior sale and thereby protect his or her junior security interest; the only protection is to allow a deficiency judgment. (*Id.,*

at p. 614; 3 Witkin, Summary of Cal. Law, *supra,* Security Transactions in Real Property, § 123, pp. 1592-1593.)[6]

Appellants argue that the facts are distinguishable from *Spangler* and that the *Spangler* exception should not apply. They basically contend that the transaction was standard within the meaning of *Brown v. Jensen, supra,* 41 Cal.2d 193. The transaction in *Brown,* however, involved no subordination. As part of the purchase price, the buyers executed a note in favor of a savings and loan association, secured by a first deed of trust. At the same time, the buyers executed a second note in favor of the seller, secured by a second deed of trust. When the savings and loan association sold the property pursuant to its power of sale, the seller's security was rendered valueless. (*Id.,* at p. 195.) The *Brown* transaction, therefore, is dissimilar to the transaction under consideration.

The *Spangler* exception applies when, in the sale of real property for commercial development, the seller subordinates his or her lien to a construction loan pursuant to an agreement of sale, and then loses his or her interest when the senior lienholder forecloses on the property. Here, the property was sold for commercial development. Within weeks of the sale, appellants had contacted Security regarding a construction loan to finance a condominium development. Shortly thereafter, architectural plans were drafted, and the process of obtaining city approval was begun. These actions demonstrate that the property was purchased for commercial development.

Appellants assert that respondents did not subordinate pursuant to an agreement of sale because (1) under the doctrine of merger, the subordination clause did not survive escrow, as it was contained in neither the deed nor the deed of trust, and (2) if the clause did survive, it was indefinite as to its terms and therefore unenforceable. The assertion is meritless. **(3)** "The rule that prior expressions are merged into the deed is not as broad and absolute as some abbreviated statements of the doctrine might indicate. To begin with, a deed requires interpretation. 'It is the duty of the Court to give the deed the same construction that the parties gave it, at the time of its execution. The Court will place itself, as nearly as possible, in the position of the contracting parties, and their intent will be ascertained in the same manner as in the case of any other contract.' (*Kimball* v. *Semple* (1864) 25 Cal. 440 at p. 449.)

"The concept of merger by deed is an application of the principle of 'integration' in written contracts generally. That principle was ex-

---

[6]Although the purchasers in *Spangler* individually waived their protection from deficiency judgments, the court did not consider the waivers in reaching its conclusion.

plained in *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225 . . .: 'When the parties to a written contract have agreed to it as an "integration"—a complete and final embodiment of the terms of an agreement—parol evidence cannot be used to add to or vary its terms. [Citations.] When only part of the agreement is integrated, the same rule applies to that part, but parol evidence may be used to prove elements of the agreement not reduced to writing. [Citations.] [¶] The crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement.'" (*Szabo* v. *Superior Court* (1978) 84 Cal.App.3d 839, 843 [148 Cal.Rptr. 837].)

Several cases have enforced preconveyance agreements, thereby rejecting the merger defense. (See *ibid.*, and cases cited therein.) Consequently, the trial court properly found an enforceable promise to subordinate, as modified by the agreement regarding subordination. Inclusion of the subordination clause in the purchase agreement satisfies the *Spangler* requirement that the seller subordinate pursuant to an agreement of sale.

Appellants' argument that the subordination clause in the purchase agreement was unenforceable due to its indefinite terms is also meritless. The subsequent agreement regarding subordination supplied the missing terms. Appellants may not now complain that the original clause was indefinite.

Finally, appellants contend that respondents did not subordinate to the construction loan in the original escrow and therefore did not subordinate pursuant to the agreement of sale. The trial court found, however, that the parties intended the subordination to occur in an escrow. Indeed, appellants admitted at trial that it was impossible for them to secure a construction loan while the purchase was in escrow. Consequently, the *Spangler* criteria have been met.[7]

There is substantial evidence to support the court's implicit finding that respondents subordinated pursuant to the agreement of sale. Respondent John Roffinella testified that he subordinated his first deed of trust to the construction loan because he had promised to do so in the agreement of sale. Respondents sought to renegotiate the terms of the subordination because appellants requested a six-month moratorium on their payments to respondents and obtained a partial and successive release of respondents'

---

[7]Respondents' belief that prior to any development their only recourse was to the property in the event of appellants' default is not fatal to their recovery. A seller's recourse is to the land if the subordination agreement is executory. (*Budget Realty, Inc.* v. *Hunter* (1984) 157 Cal.App.3d 511, 512 [204 Cal.Rptr. 48].) However, once the agreement has been executed, the procedures propounded in *Spangler* v. *Memel, supra,* 7 Cal.3d 603, must be followed to determine the applicability of section 580b.

lien on the property so SAC could convey clear title as each condominium was sold.

The risk of loss should also be placed on appellants because respondents subordinated their deed of trust to a $4.5 million construction loan. Respondents were thereby prevented from foreclosing when appellants defaulted. (*Spangler* v. *Memel, supra,* 7 Cal.3d 603, 614.)

We conclude that the transaction was a variation on the standard purchase money security transaction, and the trial court properly found that the *Spangler* exception to section 580b applied to the instant case.

B.-C.*

. . . . . . . . . . . . . . . . . . . . .

### III. *Conclusion*

The judgment is affirmed. This is not a frivolous appeal within the meaning of *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]. Respondents shall recover costs and reasonable attorney's fees on appeal.

Scott, Acting P. J., and Merrill, J., concurred.

A petition for a rehearing was denied April 18, 1986, and appellants' petition for review by the Supreme Court was denied July 16, 1986. Broussard, J., did not particpate therein.

---

*See footnote, *ante,* page 230.