[No. D004636. Fourth Dist., Div. One. Nov. 30, 1988.]

JACK WRIGHT, Plaintiff and Appellant, v.
CALVIN JOHNSTON et al., Defendants and Respondents.

334

## COUNSEL

Lesley Ann Ash for Plaintiff and Appellant.

Ronald A. Litz, Arthur Grebow, Antin, Stern, Litz & Grebow, Antin, Magasinn, Stern, Litz & Grebow, Richard C. Goodman, Paul L. Gale and Stradling, Yocca, Carlson & Rauth for Defendants and Respondents.

## OPINION

**WORK, J.**—The trial court in this case granted plaintiff Jack Wright a decree of judicial foreclosure, but denied him a personal judgment for any deficiency against the defendants Calvin Johnston, Petroculture Development Co., and Hutton Associates, Inc. ■ Wright appeals from the judgment challenging the court's application of the antideficiency provisions of Code of Civil Procedure section 580b.[1] We conclude the court ruled

---

[1] All statutory references are to the Code of Civil Procedure. Section 580b provides: "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to the vendor to secure payment of the balance of the purchase price of real property, or under a deed of trust, or mortgage, on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of such dwelling occupied, entirely or in part, by the purchaser.

"Where both a chattel mortgage and a deed of trust or mortgage have been given to secure payment of the balance of the combined purchase price of both real and personal property, no deficiency judgment shall lie at any time under any one thereof if no deficiency judgment would lie under the deed of trust or mortgage on real property."

incorrectly. We hold this case falls within the exception of section 580b as defined in *Spangler* v. *Memel* (1972) 7 Cal.3d 603 [102 Cal.Rptr. 807, 498 P.2d 1055] and accordingly we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Wright sold 1,228 acres of Imperial County farmland to Johnston for $1.5 million in February 1981. Johnston paid $300,000 cash, assumed three secured promissory notes totalling $693,555 and delivered a new secured note for $506,444. The three secured notes consisted of a first trust deed securing a $300,000 interest-only promissory note payable to Mr. and Mrs. Heise who sold the property to Wright's father in 1972; a second trust deed securing a $167,000 promissory note from Wright to his father; and a third trust deed securing a promissory note to Imperial-Yuma Production Credit Association (IYPCA) the unpaid balance of which at the time of the sale was $262,036. Except for the Heise note each of the other notes was in default.

The purchase agreement authorized Johnston to renegotiate the existing encumbrances or to replace them with debt up to $700,000 to which Wright's security would remain subordinate. Wright also agreed to subordinate to an additional $262,000 which could be used only for specified permanent improvements to the property.

Shortly after Wright sold the property he assigned his purchase money note and fourth deed of trust to IYPCA to secure an additional indebtedness. At the time of trial a reassignment of the deed of trust to Wright had not been recorded. Responding to his counsel's question as to the "ownership status of that note" Wright testified "It is out of my control. It is in the safe at P.C.A. They have it." The court found IYPCA was the holder of the purchase money note and deed of trust at all relevant times after the sale.

The parties modified their initial escrow instructions so that 240 acres were released to Johnston encumbered *only* by the trust deeds to Heise and IYPCA. Johnston used this acreage to borrow $440,000, the source of his cash down payment to Wright. Later refinancing of the 988 acres eliminated the Heise and IYPCA encumbrances from the 240 acres.

On June 19, 1982, Johnston transferred the land to Petroculture, a partnership Johnston formed with Hutton to market the property. This property was marginal farmland some of which was so bad it could not be farmed at all, requiring Wright and later Petroculture to improve the soil.

The court specifically found: "Johnston planned to continue the irrigation and reclamation program which had been started by . . . Wright and his predecessors and to expand that program to further increase productivity"; and Johnston made "considerable improvements to the property [by] the installation of tiling, ditching, irrigation systems, subsoil work, and the planting of several crops" similar to the type of farm improvements which Wright previously made.

Cotton, alfalfa, wheat and bermuda were grown on the land before Johnston acquired it. The court found Johnston purchased the property for the purpose of continuing its use as agricultural land. This finding was made notwithstanding evidence that Petroculture intended to plant jojoba on the property and market it in parcels for that purpose.

In farming the property and to implement its reclamation program Petroculture invested over $800,000 of its funds and incurred substantial additional nonpurchase debts. These expenditures required Petroculture to obtain a full recourse $1,111,110 loan from Orange Productive Credit Association (OPCA) in October 1981. This loan, secured by a fifth deed of trust, was used for interest payments and expenses for farming and other improvements.

In July 1982 the Heise note was due. Because of this obligation and the need for additional cash Petroculture refinanced the existing secured debt by obtaining a new $1,666,670 loan from OPCA secured by a first trust deed. The Heise and IYPCA notes were paid in full. The then existing OPCA loan was partially paid.

IYPCA, the then holder of the Wright note, agreed to the refinancing and continued subordinate status of Wright's trust deed provided it was paid in full. The refinancing also reversed the priority of the trust deeds to Wright and his father with Wright's fourth trust deed becoming a second, junior only to the new OPCA loan.

The court found the July 1982 subordination to the OPCA loan was not part of the initial purchase and sale transaction but was a refinancing agreement unconnected to that earlier sale. The parties were different—the Wright note was issued in the sale transaction from Wright to Johnston whereas the subordination agreement was between Petroculture and IYPCA, the then holder of the Wright note and deed of trust. IYPCA prepared the subordination agreement and later obtained Wright's signature on it. The pertinent part of that agreement provides: "That this agreement shall be the whole and only agreement between the parties hereto with regard to the subordination of the lien or charge of the deed of trust in favor of

Beneficiary to the lien or charge of the deed of trust in favor of Lender above referred to and shall supersede and cancel any prior agreements as to such, or any, subordination including, but not limited to, those provisions, if any, contained in the deed of trust first above mentioned, which provide for the subordination of the lien or charge thereof to a deed or deeds of trust or to a mortgage or mortgages to be thereafter executed.

"NOTICE; THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND."

After Petroculture sustained substantial farming and flood losses it defaulted resulting in the filing of the underlying foreclosure proceedings. The court appointed a commissioner to sell the property but determined the defendants were not personally liable for payment of any sums secured by the Wright deed of trust and accordingly were not personally liable for any deficiency between the sales price and the total amount due Wright including costs of sale. The court also determined Hutton and Petroculture were entitled to costs and attorneys' fees from Wright. It reserved jurisdiction to award additional attorneys' fees after the sale of the real property.

Wright appeals only from that portion of the judgment that denies him a deficiency judgment.

## DISCUSSION

California's antideficiency scheme has been described as complex and pervasive. (See Nelson & Wittman, Real Estate Finance Law (2d ed. 1985) § 8.3, p. 607.) These authors observe there has been an enormous increase in subordination agreements by sellers who are nonprofessionals in the real property business in which the junior encumbrancer is often a selling farmer or rancher who has subordinated a purchase money lien to nonpurchase money loans obtained by real estate promoters or developer/buyers. To the extent that a strained analysis extracted from *Brown* v. *Jensen* (1953) 41 Cal.2d 193 [259 P.2d 425], would preclude a deficiency judgment to the seller in such a situation, it was attacked by Professor Hetland as not being supported by any express language or implied policy in section 580b. (See Hetland, *Real Property and Real Property Security: The Well-Being of the Law* (1965) 53 Cal.L.Rev. 151, 161.) Such an interpretation was later rejected in *Spangler* v. *Memel, supra,* 7 Cal.3d 603, where a construction loan subordination did not bar a deficiency judgment. There, as we shall do here, the court found the policy to prevent over-valuation of land values should be viewed from the perspective of imposing personal liability on a buyer

who overencumbers the property rather than the subordinating seller. Here, as in *Spangler,* public policy is best promoted by imposing personal liability on the buyer/developer. (See Leipziger, *Deficiency Judgments in California: The Supreme Court Tries Again* (1975) 22 UCLA L.Rev. 753, 768.) *Spangler* makes clear that *Brown's* seemingly all inclusive language does not encompass "varietal" purchase money transactions. (Hetland, *supra,* fn. 66 at p. 168.)

In *Budget Realty, Inc.* v. *Hunter* (1984) 157 Cal.App.3d 511 [204 Cal.Rptr. 48], the court examined the additional jeopardy a purchase money security is exposed to, focusing on the substance of the subordination agreement. There, where no actual subordination occurred, the court held the seller's mere agreement to do so had no effect on the transaction. Similarly, it noted it would be absurd to find a transaction where the dollar amount of a subordination is minimal to be a "varietal" of *Spangler* significance. It is clear, however, that it is the substantiality of the nonpurchase money lien to which the seller subordinates in proportion to the value of the security it encumbers, that determines whether the transaction is so nonstandard that it places the buyer/borrower outside section 580b. Although the parties' agreement provided no restriction on the use of funds, $600,000 of senior lien was actually extinguished by the $1,666,670 OPCA loan to which Wright (and his father) subordinated. Because of this unrestricted nonpurchase money lien the parties not only eliminated the equity to which the Wrights could look for their security, but it made it impossible for them ever to achieve any meaningful equity position in the future.

The transaction in this case when viewed prospectively is more clearly outside the scope of the antideficiency legislation than the *Spangler* acts. Wright agreed that the entire $1,666,670 was available to Petroculture for any purpose and was largely used by Petroculture for purposes other than to improve the property or to resuscitate senior liens. In such circumstances the antideficiency provision of section 580b should not apply.

Our decision is consistent with *Roffinella* v. *Sherinian* (1986) 179 Cal.App.3d 230 [224 Cal.Rptr. 502] which is more fully explained in 1 Miller & Starr, Current Law of California Real Estate (1987 supp.) section 3.159, page 432. That decision holds that section 580b does not apply where a postsale construction loan subordination is negotiated pursuant to an agreement to do so contained in escrow instructions. The authors suggest the court's primary reliance on the fact that subordination promise was part of the original sales contract, was unnecessary. They suggest the better view is to not apply section 580b to any postsale subordinating loan to improve the property which exposes the seller to new risks because in such cases the beneficiary is subsidizing the trustor and becomes subject to the business

risk of the development. The authors go on to state the rationale would not apply when the subordination is for a purchase assistance (see *Shepherd* v. *Robinson* (1981) 128 Cal.App.3d 615 [180 Cal.Rptr. 342]) which is clearly not the case here.

The vendor's sophistication or lack in a case such as this is irrelevant. To have a result depend on the seller's degree of sophistication is both unworkable and unsound. (Leipziger, *Deficiency Judgments in California, supra,* at p. 777.) In effect Johnston borrowed additional money with Wright's assistance. It is only proper that Johnston should now repay that obligation.

In light of our disposition we also reverse the order awarding Hutton and Petroculture attorneys' fees and remand this issue to the trial court for further proceedings consistent with this opinion.

### DISPOSITION

Judgment reversed. The case is remanded for further proceedings consistent with this opinion.

Kremer, P. J., and Wiener, J., concurred.

A petition for a rehearing was denied December 20, 1988, and respondents' petition for review by the Supreme Court was denied February 15, 1989.