[Civ. No. 9806.   Third Dist.   Aug. 1, 1960.]

LUCKY INVESTMENTS, INC. (a Corporation), Respondent,
v. MARY R. ADAMS, Appellant.

Busick & Busick for Appellant.

Driver, Driver & Hunt and Morton L. Friedman for Respondent.

WARNE, J. pro tem.*—Mary Adams appeals from an adverse judgment in an action brought by Lucky Investments, Inc., to recover the balance alleged to be due and owing on each of three promissory notes executed by Adams. She contends that the trial court has entered a deficiency judgment of the sort prohibited by section 580b of the Code of Civil Procedure, which provides that "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to secure payment of the balance of the purchase price of real property. . . ."

The questions to be decided on this appeal are (1) whether certain holding agreements are actually deeds of trust or the equivalent given by Adams to secure the notes here sued upon; and (2) if so, whether those notes were given for the balance of the purchase price of real property. Adams contends that both questions must be answered affirmatively and that the judgment must be reversed in its entirety because recovery by Lucky on the notes is proscribed by the section quoted above.

The trial court received evidence of the transactions leading up to and culminating in the execution of the holding agreements which are the heart of this dispute. It appears that in June of 1954 Adams purchased three lots from Lucky, making down payments thereon and giving separate promissory notes for the balance owed on the price of each. These notes were severally secured by separate deeds of trust to the purchased lots, which were of course purchase money deeds of trust within the meaning of section 580b. Later in the year Adams was approached by a real estate agency with the suggestion that she sell the lots to the Pacific Atlas Company, a firm then engaged in the business of building residences for sale. She was agreeable to this, but it was necessary that arrangements be made so that Pacific Atlas could borrow construction money from a lending institution, and this in turn necessitated a release or subordination of Lucky's first lien in order that the lender might acquire the first lien. To carry out this general scheme Adams and the representatives of Lucky and Pacific Atlas met on January 15, 1955, together with an agent

*Assigned by Chairman of Judicial Council.

of the North American Title Guaranty Corporation, hereinafter called the title company. At that time Lucky reconveyed the three deeds of trust it had received from Adams to her and cancelled her notes in exchange for three new notes from her equal in amount to the balance remaining on the old ones. Simultaneously the parties executed the three holding agreements above referred to, one for each of the several lots.* Although only one of the agreements was introduced into evidence, it was stipulated by counsel for Adams and Lucky that all three contained the same material terms except for the description of the property to be held and the amounts specified to be owing among the parties.

The document admitted into evidence recited that the lot described had been conveyed to the title company subject to the terms of the agreement; that the title company held title to the lot for Pacific Atlas to deal with as provided in the instrument; that all parties agreed that Atlas proposed to encumber the lot with a construction loan deed of trust; and that when such a deed of trust was available for recordation the title company was authorized to deed title to the lot to Pacific Atlas so that the trust deed could be recorded, provided that title to the encumbered lot was concurrently deeded back to the title company by Pacific Atlas. The agreement then recited that Pacific Atlas was indebted to Adams in a stated amount evidenced by a note therefor, and that the title company was "irrevocably authorized" to pay to Adams from the net sales proceeds of the lot the amount so owed with interest. It was further stated that the title company was "irrevocably authorized" to pay to Lucky, from the amount which it had been previously authorized to pay Adams, a certain specified sum with interest. It was also stated that the title company was authorized to pay a commission sum to a real estate firm. The agreement then defined "net sales proceeds" as meaning the gross selling price of the lot less the amount necessary to retire the construction loan and normal seller's closing costs. Finally, it was provided that "In the event of any default of any of the terms hereunder, First Party [the title company] is hereby authorized to deed the lot . . . back to Third Party [Adams] . . . when said Third Party executed proper notes and deeds of trust to Fourth Party

---

*The agreements were signed by Adams, Pacific Atlas, and the title company as "parties" and were signed as "approved" by Lucky. The agreements make reference to a fourth party unidentified therein, but which undisputed parol evidence proved to mean Lucky. We are satisfied that Lucky was in fact a party to the agreements.

[Lucky] as may be necessary to protect the interest of the parties herein as they may then appear.''

We think that as a matter of law the holding agreements executed by the parties were instruments of trust whereunder the title company took title as trustee and undertook to administer the trust and so carry out the underlying plan and purpose of Atlas, Adams and Lucky. The interest of Lucky was to obtain payment of the debts owed to it by Adams as evidenced by the notes executed at the same time as the agreements. The interest of Adams was to obtain the amount owed to her by Pacific Atlas in excess of her debt to Lucky; that is, her profits upon the sale of the lots to Pacific Atlas. The interest of Pacific Atlas was to obtain the power to hypothecate the lots in return for a loan of construction money to build and sell residences, and to profit thereby. That a trust was created is indicated by the terms of the agreements themselves, under which the title company was given no beneficial interest in the property nor any power to deal with it for its own profit, as well as by the fact that the title company paid nothing for the transfer to it of the titles to the lots. Although the words ''trust'' or ''trustee'' are nowhere mentioned in the agreements, it is settled that no such terminology is necessary to the creation of a trust. (*People* v. *Pierce,* 110 Cal.App.2d 598, 605 [243 P.2d 585] ; *Fahrney* v. *Wilson,* 180 Cal.App.2d 694, 697, 698 [4 Cal.Rptr. 670].)

The duties of the title company are spelled out in the trust agreements with a good deal of certainty. Except for the sham double transfer of title from the title company to Pacific Atlas and back again, which was contemplated for the purpose of permitting Pacific Atlas to obtain construction funds from a lending institution in return for a first lien on the lots, it was the duty of the trustee to hold title to the lots until they were sold to home buyers; if they were so sold, it was the trustee's duty to apply the proceeds of the sales first to the retirement of the construction loan, next to the payment of Adams' debt to Lucky, next to the payment of whatever remained of the debt of Pacific Atlas to Adams over and above the amount previously paid to Lucky, and finally to Pacific Atlas, the equitable owner of the property involved. Since the agreements do not differentiate between voluntary sales by the real estate agency and involuntary sales by the lending institution in the event it was compelled to foreclose its liens, we must conclude that in any case the proceeds of such sales

were intended to be distributed in the same manner; i.e., to Lucky, Adams and Pacific Atlas in that order.

We think that the default clause of the agreements referred specifically to the default of Pacific Atlas and, in case such occurred, imposed a duty upon Adams to execute deeds of trust to Lucky. Indeed, any other interpretation of the language of that clause would place the trustee in a position in which it might not be able to voluntarily transfer legal title to anyone. Certainly the title company could not transfer legal title to Pacific Atlas if the latter defaulted upon its obligations to Adams. We believe that a correct construction of the instruments forces the conclusion that if Atlas defaulted upon its promise to Adams, all parties were duty bound to execute such documents as were necessary to return Lucky and Adams to their original positions before the dealings with Pacific Atlas began. Since the original position of Lucky was that of a creditor secured by a deed of trust, we are convinced that the only purpose and effect of the holding agreements were to enable Pacific Atlas to subordinate that deed of trust to the lending institution; that is, to enable Pacific Atlas to create a lien senior to that held by Lucky. We shall, therefore, treat Lucky as a creditor who was at all times secured by a second deed of trust to the lots, even though the trustee did not have a power of sale.

Next, assuming the holding agreements to be arrangements of trust securing Adams' debt to Lucky, we are confronted with the question of whether or not the notes sued upon were ones for the purchase price of real property. We are convinced that Adams is right in contending that they were such. It stands undisputed in the record that the first notes she gave to Lucky were purchase money notes. It stands equally undisputed that when she gave the notes being here sued upon, at the time the holding agreements were executed, the old notes were cancelled and delivered up to Adams and the new notes were given for the amount which she still owed upon the old notes. Under these circumstances we must conclude that the new notes were mere counterparts of the old, and that the nature of the debts for which they stood remained unchanged. (Compare *Spring* v. *Hill & Carr*, 6 Cal. 17, 18.)

It appears that with respect to two of the lots concerned, construction loans were obtained from the Bank of America and that Pacific Atlas subsequently defaulted upon those loans, causing the bank to foreclose upon its security. Apparently the bank's liens exhausted the proceeds of the sales

leaving nothing for the parties to the agreements. The record does not disclose that such was the case with respect to the third lot which, so far as appears, is still being held by the title company pursuant to the trust agreement.

The result of the foregoing is that with respect to the two lots which were sold through foreclosure of the construction liens this case falls within the rule of *Brown* v. *Jensen,* 41 Cal.2d 193 [259 P.2d 425], wherein it was decided that one who holds a second deed of trust to secure the balance of the purchase price of real property is precluded by section 580b of the Code of Civil Procedure from recovering a deficiency judgment upon notes given for the balance, even though his security has been exhausted by a senior lien. This rule obtains whether the first deed of trust was given for purchase money or for construction money. (*Raub* v. *Lee,* 181 Cal.App.2d 529 [5 Cal.Rptr. 444].) It is no doubt true, as the trial court said, that Lucky intended to look to the holding agreements first and to the notes second to obtain payment of Adams' debts. However Adams did not become personally liable to pay the original notes secured by deeds of trust (*Stone* v. *Lobsien,* 112 Cal.App.2d 750, 756 [247 P.2d 357]), and since the new notes given were also purchase money notes secured by the equivalent of deeds of trust, she did not become personally obligated upon them any more than she had been before the substitution was made. Whatever the intent of the parties, Adams could not waive the protection of section 580b in advance. (See *Freedland* v. *Greco,* 45 Cal.2d 462, 467 [289 P.2d 463].)

This conclusion does not work an undue hardship upon Lucky. As we said in *Raub* v. *Lee, supra,* at pages 530-531 : "One who takes a purchase money trust deed knows the value of his security and assumes the risk that it may become inadequate, especially where he takes a second purchase money trust deed, and he is precluded by this section from bringing an action on the note after the security has became valueless because of the sale under the prior trust deed."

The result of our decision is that the judgment is reversed with directions to the trial court to enter judgment in favor of Adams upon the two promissory notes representing the indebtedness upon lots which by the foreclosure of the construction lien no longer were held by the title company under the holding agreements. As to the other note the judgment is reversed with directions to the trial court to enter

judgment for Adams without prejudice to Lucky's right to take appropriate action to obtain and foreclose upon its security pursuant to section 726 of the Code of Civil Procedure.

Van Dyke, P. J., and Peek, J., concurred.