[No. D005590. Fourth Dist., Div. One. Dec. 8, 1987.]

ANTHONY BARRY LaFORGIA et al., Plaintiffs and
Respondents, v.
G. D. KOLSKY, as Trustee, etc., et al., Defendants and Appellants.

1104

**COUNSEL**

Jerry M. Leahy for Defendants and Appellants.

Kevin W. McTaggart for Plaintiffs and Respondents.

**OPINION**

**WORK, J.**—The trial court granted a motion for summary judgment in favor of respondents (hereafter LaForgia or the LaForgia group) after finding they were entitled to a deficiency judgment against appellants (hereafter Kolsky or the Kolsky group) for the balance due on a promissory note secured by a second deed of trust on real property sold to a senior lienholder at a private foreclosure sale. We reverse and direct the trial court to enter summary judgment for Kolsky. The property had been in bankruptcy, then had been removed from bankruptcy and sold to Kolsky, and then later foreclosed upon by the senior lienholder. During the sale to Kolsky, LaForgia became the equivalent of a vendor by executing new and different financing documents with the new purchaser, Kolsky. Had LaForgia not done so, the sale to Kolsky would not have occurred and the property would have remained in bankruptcy subject to foreclosure by the senior lienholder and LaForgia would have lost its investment. LaForgia, as a "vendor" under Code of Civil Procedure[1] section 580b, is barred from obtaining a deficiency judgment.[2]

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] The parties have agreed the sale issue in this case is a matter of law and should be disposed of by summary judgment. Although Kolsky filed no formal motion, LaForgia stated at oral argument that it had orally agreed to such a disposition at the trial court and we could treat the matter as if there were cross-motions for summary judgment.

## I

The following facts are undisputed. In March 1980, mortgage broker William Graham contacted a group of investors, the LaForgia group, who loaned Attorney Alan Williams $35,000 to improve his residence.[3] The loan was evidenced by a promissory note and secured by a second trust deed on the property. The first trust deed was held by California First Bank. In November 1981, Graham arranged for a second group of investors, the Kolsky group, to loan another $35,000 to Williams secured by a third trust deed. On August 4, 1982, a notice of default was recorded by California First Bank on the first trust deed. On November 1, 1982, Williams filed a Chapter 11 petition in bankruptcy court.

In March 1983, a written stipulation was entered into following negotiations instituted and conducted by Graham on LaForgia's behalf resulting in the real property being removed from bankruptcy and sold to Kolsky. The first and third trust deed holders (the bank and Kolsky) had already noticed defaults and elections to sell. Graham signed the stipulation as agent for one of the investors in the LaForgia group, and also signed it as agent for one of the investors in the Kolsky group.[4] The terms of the sale were for Kolsky to give (1) Williams a $10,000 promissory note secured by a third trust deed on the property; (2) LaForgia a new promissory note for $44,360 (representing the unpaid balance plus interest on the note owed by Williams) secured by a new second trust deed; and (3) the bank $15,000 (representing unpaid interest) and a promissory note for the unpaid principal and interest under the terms of the original first trust deed. The bankruptcy court authorized the sale based on the consent of all the creditors, including LaForgia. The application to the bankruptcy court for the sale of the property recites the property was appraised at $400,000 and the total purchase price was $419,981.35.[5]

Kolsky and LaForgia vigorously, but unsuccessfully, jointly attempted to sell the property up to the date of the eventual purchase by the bank at a private foreclosure sale.

---

[3] This property is a registered historical residence, a fact which eventually proved to make it impossible to market at a price sufficient to enable either Kolsky or LaForgia to recover its investment.

[4] Actually, we are told Graham had ongoing business relations with everyone in this scenario. He was a client of Attorney Williams and Williams was his client in these loan brokering transactions. He had a prior working relationship with some members of both the LaForgia and Kolsky groups and with the senior lienholder.

[5] The purchase price included the $10,000 to Williams; the note to the bank for $270,000; accrued unpaid interest and expenses to the bank of $47,625.30; the note and interest due LaForgia of $45,221.49; the note and interest due Kolsky of $43,274.76; and property taxes of $3,859.80.

Kolsky characterizes the transaction as one in which all investors tried to save their investments by agreeing to Kolsky's purchase to retrieve the property from bankruptcy for the purpose of resale with an opportunity to recoup their investments. LaForgia characterizes the transaction as one in which *only* Kolsky was trying to save its investment by buying the property, and that Kolsky merely assumed the debt due LaForgia.

In short, Kolsky asserts LaForgia was effectively part of the sales transaction and thus a vendor of real property barred from a deficiency judgment. In contrast, LaForgia contends it was essentially a bystander to the sales agreement who only agreed to accommodate the desires of the senior lienholder and Kolsky, and its original status as a nonpurchase money lender outside of the antideficiency statute was not changed. LaForgia's contention is undercut by the deposition testimony of its member Anthony LaForgia, a real estate broker who is trustee for one of the members of the LaForgia group. Mr. LaForgia states he discussed with mortgage broker Graham what steps should be taken to try to save the security interests from the bankruptcy, and that he participated on the LaForgia group's behalf in the unsuccessful attempt to resell the property after Kolsky's purchase.[6]

## II

To succeed in a motion for summary judgment, the moving party must present evidence in the form of affidavits, declarations, admissions, answers to interrogatories, depositions, or judicially noticeable matters which set forth facts sufficient to sustain a judgment in his favor. (§ 437c, subd. (b); *Rincon* v. *Burbank Unified School Dist.* (1986) 178 Cal.App.3d 949, 954 [224 Cal.Rptr. 88].) Because of the drastic nature of the summary judgment procedure and the importance of safeguarding the adverse party's right to a trial, the moving party must make a strong showing (*Rincon* v. *Burbank Unified School Dist., supra,* 178 Cal.App.3d at p. 955), and doubts should be resolved in favor of the party opposing the motion (*People* ex rel. *Riles* v. *Windsor University* (1977) 71 Cal.App.3d 326, 331 [139 Cal.Rptr. 378]).

Here, the evidence presented shows Kolsky's characterization of the sales transaction as a joint effort by LaForgia and Kolsky to save their investments is the accurate one. LaForgia was a named party to the stipulation which states the parties to the agreement desire to settle the adversary

---

[6]Mr. LaForgia realized his security interest in the property was threatened by the bankruptcy. When Graham told him that Kolsky might be willing to take over the property and asked Mr. LaForgia what he was willing to do to help, the LaForgia group lowered the interest rate on the note by 2 percent and rolled the accrued interest over into the principal to induce Kolsky to buy the property.

proceedings and sell the property to Kolsky. Moreover, the bankruptcy court's authorization of the sale was expressly premised on obtaining the consent of all creditors. The fact the property was in foreclosure, then in bankruptcy, and when sold to Kolsky was encumbered over its appraised value, shows the security interests of *both* Kolsky and LaForgia were threatened at the time of the sale to Kolsky.[7] The accuracy of Kolsky's characterization of the transaction is reinforced by the fact that Mr. LaForgia, as a member of the LaForgia group, was concerned with saving its security interest, wanted the property to be sold to Kolsky, and agreed to help out the deal by lowering the interest rate. (See fn. 6, *ante.*) Under these circumstances, LaForgia cannot be characterized as a nonparticipating bystander to the sale but, as explained below, is properly characterized as a vendor under section 580b.

## III

Section 580b[8] bars deficiency judgments against a purchaser of real property whose property is sold at a foreclosure sale, even if the purchase money trust deed holder loses his security because of foreclosure by a senior encumbrancer. (*Spangler* v. *Memel* (1972) 7 Cal.3d 603, 610-611 [102 Cal.Rptr. 807, 498 P.2d 1055]; *Goodyear* v. *Mack* (1984) 159 Cal.App.3d 654, 657 [205 Cal.Rptr. 702].) When a transaction involves a variation of the standard purchase money mortgage transaction, the antideficiency statute applies only if the factual circumstances come within the purposes of the statute. (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 611.) In the standard purchase money mortgage transaction, the vendor of real property retains an interest in the land sold to secure payment of part of the purchase price. (*Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 41 [27 Cal.Rptr. 873, 378 P.2d 97].) The transaction here is a variation of the standard purchase money mortgage transaction since LaForgia's original loan to Williams was not for the purchase of real property (*Allstate Savings & Loan Assn.* v. *Murphy* (1979) 98 Cal.App.3d 761, 764 [159 Cal.Rptr. 663]), and since LaForgia was not the legal owner of the property sold to Kolsky. The issues are (1) whether LaForgia was a vendor of its interest in the property

---

[7] The undisputed fact (submitted by Kolsky and not contested by LaForgia) that the property was encumbered in excess of its fair market value, is consistent with the parties' inability to sell it over a long period of time.

[8] Section 580b states in pertinent part: "*No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract* of sale, or *under a deed of trust,* or mortgage, *given to the vendor to secure payment of the balance of the purchase price of real property,* or under a deed of trust, or mortgage, on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of such dwelling occupied, entirely or in part, by the purchaser." (Italics added.)

(rather than a third party lender) for purposes of the antideficiency statute,[9] and (2) whether LaForgia's nonpurchase money loan was transmuted into a purchase money loan when the loan was extended to Kolsky for Kolsky's purchase of the property.

■ One of the purposes of the antideficiency statute is to prevent over-valuation of land by placing the risk of inadequate security on the purchase money mortgagee. (*Spangler* v. *Memel, supra,* 7 Cal.3d at p. 612.) LaForgia and Kolsky were both junior encumbrancers. Since LaForgia's security interest was threatened by Williams's default and bankruptcy, LaForgia would have known Kolsky's assumption of ownership would not alone save its threatened security interest, but required a resell of the property. (See *Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d at pp. 42-43 and *Spangler* v. *Memel, supra,* 7 Cal.3d at p. 612 [a vendor who knows the value of his security assumes the risk of its inadequacy[10]].) Since the sales transaction to Kolsky was a mutual effort by the creditors to stop the bankruptcy and give them a chance to recoup their money by seeking a new buyer, Kolsky should not bear the entire loss arising from the inadequate security after the attempt to resell failed.

■ A "vendor" under the antideficiency statute has been liberally con-strued. (*Shepherd* v. *Robinson* (1981) 128 Cal.App.3d 615, 623 [180 Cal.Rptr. 342], citing *Jackson* v. *Taylor* (1969) 272 Cal.App.2d 1 [76 Cal.Rptr. 891].)

In *Jackson* v. *Taylor, supra,* 272 Cal.App.2d 1, the plaintiffs were the original owners who sold to a first purchaser, retaining a second trust deed on the property to secure a part of the purchase price. When the first purchaser defaulted and the first trust deed holder (a bank) recorded a notice of default and election to sell, the plaintiffs unsuccessfully tried to find a buyer in order to protect their interest under the second trust deed. The first purchaser was able to find a buyer, the defendants. As part of the sales transaction to the defendants, the plaintiffs agreed to accept a new promissory note in a larger amount and a new second trust deed from the defendants. When the defendants defaulted and the property was purchased at a foreclosure sale by the bank holding the first trust deed and the plain-tiff's security interest under the second trust deed was exhausted, the court

---

[9] Section 580b by its terms bars all lenders from obtaining deficiency judgments only if the purchasers buy a dwelling which they occupy; for other real property sales transactions it only bars lenders who are *vendors* from obtaining deficiency judgments. Since Kolsky did not occupy the residence, LaForgia is barred only if it was a vendor of its interest.

[10] Both *Roseleaf* [seller took second deed of trust on another piece of property owned by the purchaser] and *Spangler* [seller took second deed of trust subordinate to a construction loan taken out by the purchaser-developer] involve factual situations where the vendor did *not* know the value of his security and section 580b was held not applicable.

held the plaintiffs were barred from obtaining a deficiency judgment. The court in *Jackson* reasoned that even though the plaintiffs were not the legal owners of the property, they were a necessary party to the sale, and by consenting to and participating in the sale, they were *vendors* of their interest under the original trust deed, the latter which was a necessary part of the purchase price of the property. (*Id.* at pp. 6-7.)

*Jackson*'s holding was followed in *Shepherd v. Robinson, supra,* 128 Cal.App.3d at page 623. In *Shepherd,* the plaintiff seeking the deficiency judgment had sold to a first buyer and retained a first trust deed, and then later agreed to cancel the first deed and accept a second deed when the first buyer was having financial problems and sold to a second buyer. When the second buyer defaulted and the bank's foreclosure extinguished the plaintiff's security, the plaintiff was held to be barred from a deficiency judgment against the second buyer. *Shepherd* relies on the reasoning in *Jackson* to reach its conclusion that the plaintiff, although not the legal owner of the property, was a vendor who sold his security interest to the second buyer in exchange for a new interest and in order to allow the second buyer to make the purchase.[11] (See also *Stockton Sav. & Loan Bank v. Massanet* (1941) 18 Cal.2d 200, 208 [114 P.2d 592].)

Similarly here, LaForgia, in an attempt to save its threatened security interest, in effect sold its original second trust deed for a new security interest to allow Kolsky to purchase the property. It is effectively a vendor who extended a loan for the purchase of real property under the antideficiency statute.

In both *Jackson* and *Shepherd,* the loan made by the original seller was for the purchase of real property. In *Jackson v. Taylor, supra,* 272 Cal.App.2d at page 5, the court held the character of the loan did not change when the first buyer sold to the second buyer. In contrast here, LaForgia's loan to Williams for improvements on his residence was not a purchase money mortgage, and we are holding that the loan changed to a purchase money loan when it was extended to Kolsky. LaForgia asserts that *Jackson's* analysis (that a lienholder may be a vendor giving a purchase money loan) does not apply here since the nature of a trust deed is determined at the time it is executed, and its nature is then fixed for all time, citing *Brown v. Jensen* (1953) 41 Cal.2d 193, 197 [259 P.2d 425], *Paramount Sav. & Loan Assn. v. Barber* (1968) 263 Cal.App.2d 166, 169 [69 Cal.Rptr. 390], and *Lucky Investments, Inc. v. Adams* (1960) 183 Cal.App.2d 462, 466 [7 Cal.Rptr. 57].

---

[11] The court's reasoning in *Shepherd* has been described as "tenuous." (Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 1987 Supp.) § 4.32, p. 50.)

*Brown* merely holds that a junior lienholder may not obtain a deficiency judgment after his security has been lost by a foreclosure sale of a senior lienholder. In so holding, *Brown* states the rule that if a deed is a purchase money deed at the time it is executed, it retains the same character at the time of foreclosure even if by that time the security had been rendered valueless. (*Brown* v. *Jensen, supra,* 41 Cal.2d at p. 197.) *Brown* has nothing to do with a resell-type situation and does not stand for the broad proposition that the nature of a loan cannot change when the property securing it is subsequently resold.

In a passage of pure dicta, *Paramount Sav. & Loan Assn.* v. *Barber, supra,* 263 Cal.App.2d at pages 169-170, the court mentions the nature of a trust deed is determined at the time it is executed (relying on *Brown*). In *Paramount,* a nonpurchase money loan secured by a trust deed was assumed by subsequent purchasers of the property, and the court concluded there was no evidence the loan was intended to be part of the purchase price. This holding does not preclude a finding that the nature of a loan secured by a trust deed may change if there is evidence the nonpurchase money loan later became part of the purchase price of the property.[12]

The holding in *Lucky Investments, Inc.* v. *Adams, supra,* 183 Cal.App.2d at page 466, is similar to *Paramount's.* In *Lucky,* the seller retained a first trust deed, and then later agreed to subordinate her deed to a deed obtained by the lender of a second purchaser. *Lucky* merely holds the circumstances showed that the seller's new notes were mere counterparts of the old, and the nature of the debts remained unchanged, thus barring the seller from obtaining a deficiency judgment. Nothing in *Lucky* precludes a holding that under other circumstances the nature of a debt may indeed change.

Illustrative of a situation where the nature of a loan secured by a trust deed changed, is *Goodyear* v. *Mack, supra,* 159 Cal.App.3d at pages 656-657, in which a purchase money loan was held to have changed to a non-purchase money loan during a subsequent refinancing transaction. The buyer bought the property from Goodyear, and Goodyear retained a first trust deed to secure the loan used for the purchase price. When the buyer went into default and foreclosure proceedings commenced, the buyer and Goodyear reached an agreement whereby the first trust deed was reconveyed and the note extinguished. A new loan was executed, secured by a fourth trust deed on another piece of property owned by the buyer. When the new security was lost in a foreclosure sale by a senior lienholder, the court held Goodyear was not barred from obtaining a deficiency judgment.

---

[12]See discussion in Secured Real Estate Transactions (Cont.Ed.Bar 1974) section 9.23, page 210.

*Goodyear* reasons that although the original trust deed and note were a purchase money mortgage, that status was changed when the new sales agreement was reached. The court noted that the buyer had not lost the property purchased from Goodyear, and thus was not in the position section 580b was designed to prevent (i.e., a buyer losing the property purchased and yet remaining liable for the purchase price). (*Id.* at p. 658.) Indeed, if the buyer was released from the deficiency judgment, he would be permitted to retain the property without paying the agreed-upon purchase price. Additionally, since the new security was on a different piece of property than the one purchased from Goodyear, Goodyear would not have had any greater knowledge of the value of the security than the buyer had. (*Id.* at p. 659.)

In sum, there is no flat rule that the nature of a loan secured by a trust deed *never* changes in subsequent sales transactions. Instead, the proper inquiry is whether the facts are such that the purposes of the antideficiency statute will be advanced by applying it to a particular variation on a standard purchase money mortgage. The general statement of the law in *Jackson* v. *Taylor, supra,* 272 Cal.App.2d 1, is applicable here; i.e., a lienholder who participates in a sales transaction and agrees to extend his loan to the new purchaser in an attempt to save his security interest, may properly be construed as a vendor if necessary to effectuate the purposes of the antideficiency statute.

 We conclude that although LaForgia's original loan to Williams was not to purchase real property, it was transmuted into the equivalent of a purchase money mortgage when rewritten. All factors which were *not* present in *Goodyear* and thus justified a holding that the purchase money mortgage had changed into a nonpurchase money loan, are present here and justify the converse holding. That is, Kolsky has lost the property and its investment, and thus was in a position equivalent to the one section 580b was designed to prevent; i.e., losing the property and yet remaining liable for the purchase price. Moreover, since LaForgia's security interest was already threatened, if not worthless, at the time of the sale to Kolsky it is not inequitable they should share in the loss. By relinquishing their existing, valueless, security position vis-à-vis Williams in an effort to place themselves in an improved financial posture with a new owner to induce the sale, LaForgia entered a new security relationship on different terms with a new borrower.

LaForgia is not akin to a third party lender in a commercial transaction, to which the protection of the antideficiency statute does not extend. (See, e.g., *Kistler* v. *Vasi* (1969) 71 Cal.2d 261, 263 [78 Cal.Rptr. 170, 455 P.2d 106] [broker who lent purchasers money in exchange for second trust deed

in commercial transaction entitled to deficiency judgment].) Where the purpose of the loan was to induce the sale to Kolsky to resuscitate both the LaForgia and Kolsky investment, LaForgia is more like a vendor, rather than an outside third party making a loan. As a vendor, it is not entitled to a deficiency judgment for a loan extended to purchase the property and which was secured by the property purchased. (*Shepherd* v. *Robinson, supra,* 128 Cal.App.3d at p. 625.)

### DISPOSITION

Judgment reversed. The superior court is directed to enter summary judgment for Kolsky.

Kremer, P. J., and Thaxton, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied March 17, 1988.

---

* Assigned by the Chairperson of the Judicial Council.