[L.A. No. 29979. In Bank. July 18, 1972.]

MAY H. SPANGLER, Cross-complainant and Respondent, v.
SHERWIN L. MEMEL et al., Cross-defendants and Appellants.

## COUNSEL

Richards, Watson & Hemmerling, Richards, Watson & Dreyfuss, James J. Cook and Harry L. Gershon for Cross-defendants and Appellants.

George R. Maury, James C. Maupin and Ball, Hunt, Hart, Brown & Baerwitz for Cross-complainant and Respondent.

## OPINION

**SULLIVAN, J.**—In this action to foreclose a deed of trust, cross-defendants Sherwin L. Memel, Robert A. Memel and Sol Kossoff appeal from a judgment entered in favor of cross-complainant, May Spangler, and against said cross-defendants in the sum of $44,684.25 together with interest and costs.

In 1956 Ralf and May Spangler purchased a lot on Sunset Boulevard in Los Angeles for $43,000. The property was improved with a single-family, two-story residence, which Ralf converted into an office for his advertising business. The property which was zoned for commercial use, appreciated in value in view of the possibility of erecting a commercial office building upon the site.

In 1960 Ralf and May decided to try to realize the property's potential for commercial development by listing it for sale with Hubert Boisvert, a licensed real estate broker. In 1961 Ralf quitclaimed all his interest in the property to May, who thereby became the sole owner of the property. However, Ralf continued to act with full authority as her agent in selling the property.

In the summer of 1961, Mr. Arnold, a salesman for Mr. Boisvert, the real estate broker, contacted Sherwin Memel and informed him the property was available. Throughout the month of August, negotiations were carried on between, on the one hand, Messrs. Arnold and Boisvert, acting for the Spanglers and, on the other, Sherwin and Robert Memel, acting for

Memel-Kossoff Ventures, a partnership. On August 24, 1961, agreement was reached and escrow opened to consummate the sale of the property to Memel-Kossoff Ventures for $90,000 on the following terms; $26,100 in cash, plus a promissory note for $63,900 secured by a purchase money deed of trust, which was to be subordinated to construction loans up to the amount of $2 million.

Ralf Spangler, on behalf of his wife May, insisted that Robert Memel, Sherwin Memel, Sol Kossoff and Leon Kossoff, the four general partners of Memel-Kossoff Ventures, in return for Mrs. Spangler's agreement to subordinate her prior lien to lenders of construction money, each individually waive their protection from deficiency judgments and each give a written personal guaranty of joint and several liability for the payment of the $63,900 promissory note. Ralf so insisted in order to protect his wife against the hazard that her purchase money trust deed might become valueless in the event the holder of a future prior encumbrance securing a construction loan should foreclose. This agreement was embodied in the escrow instructions, and during escrow each partner signed a written personal guaranty and waiver of the anti-deficiency statutes.[1]

Memel-Kossoff Ventures transferred the property to MKS Investment Co. (MKS), a partnership consisting of the four general partners plus Irving Shapiro, an architect. MKS negotiated a construction loan with Union Bank in the amount of $408,000 in order to construct an office building upon the property. MKS gave Union Bank a promissory note in the amount of $408,000, secured by a first deed of trust in that amount. Union Bank, as a condition to this loan, required May Spangler to execute a specific subordination agreement recognizing the priority of Union Bank's lien, in lieu of the automatic subordination clause contained in the original trust deed. This agreement was executed on November 29, 1962.

MKS used the $408,000 to construct a three-story commercial office building on the property. Despite diligent efforts by the partners to obtain tenants, the building was never a commercial success. The project failed due to higher costs than expected, because the building was noncompetitive in attracting tenants as compared to other new buildings in the area,

---

[1]The guaranty reads as follows: "In connection with the Deed of Trust and Note in the amount of $63,900.00 executed by the undersigned Memel-Kossoff Ventures, a Partnership, we the undersigned do specifically, jointly and severally personally guarantee payment of the above described note and deed of trust as per their terms; and we the undersigned do hereby waive all provisions of Law to the contrary and specifically agree that we and each of us will be personally liable for any deficiency amount of money which may remain unpaid in the event of foreclosure and sale thereunder. Such Trust Deed shall be personally signed by Robert A. Memel, Sherwin L. Memel, Sol Kossoff and Leon Kossoff."

due to the inability to obtain a take-out loan when the Union Bank loan became due and because of the failure to sell the building. MKS was unable to make payments upon the note.

On September 7, 1965, Union Bank brought the present action to foreclose its first deed of trust. It secured a judgment of foreclosure and subsequently purchased the property at the ensuing foreclosure sale for $440,000. Since the $440,000 price at the foreclosure sale was $45,943.08 less than the amount of indebtedness, Union Bank recovered a deficiency judgment from the individual partners of MKS. It thereafter entered a satisfaction of judgment on February 16, 1969 and is no longer a party to the case in any respect.

In February 1967, May Spangler, the seller of the property and one of the defendants in the foreclosure action, having had her subordinated purchase money deed of trust rendered valueless by the bank's foreclosure, filed an amended cross-complaint (hereafter for convenience "cross-complaint") against Memel-Kossoff Ventures, a partnership; Sherwin Memel, Robert Memel, Leon Kossoff and Sol Kossoff, individually and as partners, their wives; and Union Bank. The ensuing procedural progress of the action, though quite complicated, is not material to the resolution of this appeal and is, therefore, set forth in the margin.[2] Ultimately, cross-complainant, May Spangler, alleged a single cause of action against cross-defendants Sherwin Memel, Robert Memel and Sol Kossoff, to enforce

[2]Apparently demurrers were sustained to Mrs. Spangler's original cross-complaint, though the record is silent. On February 7, 1967 she filed an amended cross-complaint alleging four causes of action: (1) that plaintiff's subordination agreement with Union Bank had become null and void since Union Bank had extended MKS' time for payments and that, therefore, her deed of trust became prior; (2) that the Memel brothers and Kossoff brothers had fraudulently represented that their personal written guaranties and waiver of anti-deficiency protection were valid and enforceable, knowing them to be illegal and unenforceable, and thereby induced plaintiff in reliance thereon to agree to subordinate her prior lien; (3) that the Memel and Kossoff brothers were estopped to assert their protection under the anti-deficiency statutes; and (4) that her lien is senior to that of Union Bank. On February 17, 1967 a demurrer was filed as to all four causes of action, claiming that none stated facts sufficient to state a cause of action. On May 3, 1967 the trial court sustained the demurrer as to the first, third and fourth causes of action, but overruled the demurrer as to the second cause of action. On May 19, 1967 the Memel and Kossoff brothers filed their answer to the one remaining cause of action, the one claiming fraud.

Trial commenced September 2, 1969 on the claim of fraudulent misrepresentation by the Memel and Kossoff brothers. At the conclusion of all the evidence, at the suggestion and with the approval of the trial court, Mrs. Spangler amended her amended cross-complaint to state a fifth cause of action seeking to enforce the written guaranties of Sherwin Memel, Robert Memel and Sol Kossoff.

Leon Kossoff, the fourth partner, died during the pendency of the action, no claim was ever made against his estate, and so the action was dismissed as to him. The trial court gave judgment in favor of the wives of the four partners as against Mrs. Spangler. This portion of the judgment is not appealed from.

their written personal promises to guarantee jointly and severally, payment of the promissory note of Memel-Kossoff Ventures for $63,900 and to waive their protection under the anti-deficiency statutes.

After finding the facts to be as already narrated, the trial court further found[3] that the Spanglers and cross-defendants intended that the agreement by cross-complainant to subordinate her prior lien in favor of construction money lenders be given in consideration for and contemplation of the personal guaranty from each partner, plus each partner's waiver of protection against deficiency judgments. The trial court further found that the guaranty and waiver of anti-deficiency protection in return for the subordination clause was a separate obligation from the purchase of the property.

The court concluded: (1) that because the guaranty was a separate obligation from the partnership obligation within the meaning of section 15015, subdivision (b) of the Corporations Code, *Riddle* v. *Lushing* (1962) 203 Cal.App.2d 831 [21 Cal.Rptr. 902] was not controlling;[4] (2) that cross-defendant partners were estopped from raising the defense of the unenforceability of the guaranty as a proscribed deficiency judgment because (a) cross-complainant, believing the guaranty to be enforceable, detrimentally relied upon it; and (b) there is no public policy against enforcing the promise of a partner separately made, even if that promise is to waive protection against deficiency judgments and (3) that cross-complainant was entitled to judgment against cross-defendants in the sum of $44,-684.25, together with interest and costs. Judgment was entered accordingly. This appeal followed.

The principal dispute engaged in by the parties revolves about California's anti-deficiency statutes. Cross-defendants contend that cross-complainant is actually attempting to obtain a deficiency judgment in connection with a purchase money deed of trust, that any such recovery is barred by section 580b of the Code of Civil Procedure[5] as construed in

---

[3]The trial court also found that cross-defendants did not make any intentional or negligent misrepresentations of fact or law, nor did they intentionally or negligently conceal any material facts.

[4]In *Riddle* v. *Lushing, supra,* 203 Cal.App.2d 831, the court held that since partners are jointly and severally liable for obligations of the partnership, a personal guaranty by the partners individually of a promissory note of the partnership secured by a deed of trust given to secure the purchase price of property did not constitute additional security and thus change the nature of the transaction so as to render Code of Civil Procedure section 580b inapplicable on the basis that it was a true guaranty not protected against a deficiency judgment. (See *Heckes* v. *Sapp* (1964) 229 Cal.App.2d 549 [40 Cal.Rptr. 485].)

[5]At the time of the transaction section 580b provided in pertinent part: "No deficiency judgment shall lie in any event after any sale of real property for failure

*Brown* v. *Jensen* (1953) 41 Cal.2d 193 [259 P.2d 425], and that cross-defendants' guaranty and waiver, being merely an attempt to circumvent the above statute, is illegal and unenforceable. Cross-complainant, on the contrary, urges that *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35 [27 Cal.Rptr. 873, 378 P.2d 97] has impliedly overruled *Brown* v. *Jensen* to the extent that section 580b cannot be applied to sold-out junior lienors seeking recovery of the purchase price. ▮ As will appear, we reject cross-complainant's dilution of *Brown* v. *Jensen* and reaffirm its continued vitality. We hold, however, that the application of *Roseleaf* to the facts of this case compels the conclusion that section 580b is here inapplicable.

In *Brown* v. *Jensen, supra,* this court held that section 580b (see fn. 5, *ante*) which proscribes a deficiency judgment after any sale of real property under a deed of trust or mortgage, given to the vendor to secure payment of the balance of the purchase price, applies to a junior lienor whose security has been rendered valueless by foreclosure of a senior encumbrance. The plaintiff in that case sold real property to the defendants, who as part of the purchase price executed a note in favor of a savings and loan association secured by a first deed of trust on the property and, also as part of the purchase price, a note in favor of the plaintiff secured by a second deed of trust on the property. The defendants defaulted on the first note and the savings and loan association caused the property to be sold under the power of sale contained in the first deed of trust, thus rendering valueless the security under the plaintiff's second deed of trust.

The plaintiff then brought an action on her promissory note to recover the unpaid balance of the purchase price and in order to meet the "one form of action" rule of section 726 alleged in the complaint that her security had become valueless as a result of the sale under the first deed of trust. This court held section 580b applicable since the second deed of trust was a purchase money deed of trust, even though there had been no sale of the property under that instrument. We reasoned: "The section states that in *no event* shall there be a deficiency judgment, that is, whether there is a sale under the power of sale or sale under foreclosure, or no sale because the security has become valueless or is exhausted." (*Brown* v. *Jensen, supra,* 41 Cal.2d 193, 198; original italics.)

We have never overruled or modified this central ruling that section 580b applies to a sold-out junior lienor holding such security for the pay-

---

of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to secure payment of the balance of the purchase price of real property."

Hereafter, unless otherwise stated, all section references are to the Code of Civil Procedure.

▮

ment of the balance of the purchase price. Indeed, as will become clear in the following discussion, all subsequent decisions by this court on the applicability of section 580b have assumed that this section by its terms applies to sold-out junior lienors and have gone on to determine whether the particular purchase money situation in question fell within the purposes of section 580b.

In *Roseleaf Corp.* v. *Chierighino, supra,* 59· Cal.2d 35, also involving a junior lienor, we examined in depth the purposes and scope of the anti-deficiency legislation (§§ 580a-580d, 726) and held that sections 580a and 580d by their terms did not apply to sold-out junior lienors.[6] We assumed without argument or question that section 580b applied by its terms to sold-out junior lienors.[7] Nevertheless we concluded that section 580b automatically applied only to the standard purchase money transaction and that with respect to variants from this standard purchase money transaction, section 580b would apply only if the factual circumstances came within the purposes of the section. "Section 580b was apparently drafted in contemplation of the standard purchase money mortgage transaction, in which the vendor of real property retains an interest in the land sold to secure payment of part of the purchase price. Variations on the standard are subject to 580b only if they come within the purpose of that section." (*Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d 35, 41.)

In *Bargioni* v. *Hill* (1963) 59 Cal.2d 121 [28 Cal.Rptr. 321, 378 P.2d 593], decided three weeks after *Roseleaf,* we held section 580b applicable to a sold-out junior lienor, a real-estate broker who partially financed the purchase of the property by accepting for his commission the purchaser's promissory note secured by a second deed of trust. In *Kistler* v. *Vasi* (1969) 71 Cal.2d 261 [78 Cal.Rptr. 170, 455 P.2d 106] this court cited *Brown* v. *Jensen* approvingly as reinforcing our determination in *Bargioni.*

Thus, we reaffirm our ruling in *Brown* v. *Jensen* that section 580b by

---

[6]"The 'one form of action' rule of section 726 does not apply to a sold-out junior lienor [citations] . . . . [Par.] The fair-value limitations of sections 580a and 726 likewise do not apply to a junior lienor, such as Roseleaf, whose security has been rendered valueless by a senior sale." (*Id.* at p. 39.) "Section 580a refers to a suit for the balance due on an obligation secured by a mortgage or deed of trust 'following the exercise of the power of sale in *such* deed of trust or mortgage.' (Italics added.) [Citation.]" (*Id.* at p. 40.) "This language [in section 580d] is similar to that in sections 580a and 726. '[S]uch mortgage or deed of trust' refers to the instrument securing the note sued upon. Thus section 580d does not appear to extend to a junior lienor whose security has been sold out in a senior sale." (*Id.* at p. 43.)

[7]There was no need for the court to determine whether section 580b should apply to the factual situation in *Roseleaf,* unless it in fact did apply by its language. Moreover, *Brown* v. *Jensen,* was cited with approval.

its language applies to sold-out junior lienors holding a purchase money mortgage or deed of trust. We point out, however, that as we said in *Roseleaf,* such ruling applies automatically only to the standard purchase money situation. We are of the view that if the transaction in question is a variation on the standard purchase money mortgage or deed of trust transaction, it should be examined so as to determine whether it subserves the purposes of section 580b as explicated by us in *Roseleaf* and *Bargioni.* We now address ourselves to this matter.

■ The crux of the matter is, of course, whether a sale of real property for commercial development in which the vendor agrees to subordinate his senior lien under the purchase money deed of trust to the liens of lenders of the construction money for the commercial development is a variation on the standard purchase money mortgage transaction. (*Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d at p. 41.) It seems clear that it is. In the standard transaction the vendor usually sells the property to a purchaser who is going to continue the same or similar use of the property. The present security value of the property, therefore, is a reliable indicator of its actual fair market value. However, in the situation where the vendor agrees to subordinate his lien to the purchaser's construction loan, the purchaser does not intend to continue with the same use of the property but actually intends a different use which contemplates considerable improvement of it. In this latter situation, the present security value of the property, therefore, is *not* a reliable indicator of the ultimate value of the property; that value will be determined by the success of the venture which contemplates a *change* in the use of the property.

In *Handy* v. *Gordon* (1967) 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848] this court delineated the minimum terms necessary to constitute an enforceable subordination clause in an agreement of purchase and sale so that the vendor would not be "forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price." (*Id.* at p. 581.) We there said: "Even if we were to assume that a contract of sale contemplating subdivision by the vendee is sufficiently different from the usual land sale contract to take it out of the operation of the anti-deficiency legislation (Code Civ. Proc., § 580b; see Hetland, *Real Property,* 53 Cal.L.Rev. 151, 161-162), the personal liability alone of the vendee would not constitute sufficient protection to the vendor to permit specific performance. [Citations.]" (*Id.* at p. 581.)

We, therefore, conclude that the subordination clause situation is sufficiently different from the standard purchase money mortgage situation to

remove it from automatic application of section 580b and to require an analysis of this factual setting in light of the purposes of section 580b in order to determine the applicability of that section.

In *Roseleaf,* we described the purposes of section 580b as follows: "Section 580b places the risk of inadequate security on the purchase money mortgagee. A vendor is thus discouraged from overvaluing the security. Precarious land promotion schemes are discouraged, for the security value of the land gives purchasers a clue as to its true market value. [Citation.] If inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability. Section 580b thus serves as a stabilizing factor in land sales." (*Roseleaf Corp.* v. *Chierighino*, *supra,* 59 Cal.2d 35, 42.)

In *Bargioni,* we restated and summarized the purposes of section 580b thusly: "The purposes are to discourage land sales that are unsound because the land is overvalued and, in the event of a depression in land values, to prevent the aggravation of the downturn that would result if defaulting purchasers lost the land and were burdened with personal liability." (*Bargioni* v. *Hill, supra,* 59 Cal.2d 121, 123.)

Thus we emphasized in both *Roseleaf* and *Bargioni* that the first clear purpose of the statute is to prevent overvaluation in those situations where "the security value of the land gives purchasers a clue as to its true market value," by placing the risk of inadequate security on the purchase money mortgagee. In the standard purchase money mortgage transaction involving a junior lienor, the purchaser generally speaking has not been able to meet the value placed on the land by the vendor by giving the latter a normal cash down payment and obtaining from a third party lender a loan for the balance of the purchase price using the property as security. Obviously such a loan could not be obtained since the amount of the loan would exceed the security value. Instead, it usually happens that the purchaser will finance the balance of the purchase price by obtaining a third party loan equal to the security value, secured by a first deed of trust on the property, and by also giving the vendor a promissory note for the difference between the purchase price (less any down payment) and the security value, said note being secured by a second deed of trust on the property. We reasoned in *Roseleaf* that in such situation, the inability of the purchaser to obtain the purchase price from a lender using the land as security, should warn the vendor that he is perhaps overvaluing the land, and that he insists, at his peril, upon his premium price secured by a second trust deed.

However, where the agreement of sale contains a subordination clause, a markedly different situation is presented. Because of the unique character and effect of that clause, the security value of the land at the time of the agreement gives neither vendor nor purchaser any clue as to its true market value. In the typical subordination clause situation, the vendor is selling the property for commercial development; for example, in the instant case, defendants purchased the land for the purpose of constructing and operating a commercial office building. The market value of the land depends upon the likelihood of the success of the commercial development; the success of the commercial development depends upon the obtaining of loans to construct it; the securing of these loans depends upon the ability of the purchaser to give the lender a senior security interest. Consequently a vendor, who wishes to receive a purchase price reflecting the commercial potential of the project must be willing to subordinate his security interest to that of the construction lender.

If in such situation section 580b is applied to prevent the vendor from suing on his promissory note, after the development has failed and the senior lienor has caused the property to be sold, the risk of the failure of the commercial development is thrust upon the vendor. In fact, however, the success of the commercial development depends upon the competence, diligence and good faith of the developing purchaser. It would seem proper, therefore, that the purchaser not the vendor bear the risk of failure, particularly since in the event of default, the junior lienor vendor will lose both the land and the purchase price.

In this factual context, the security value of the property at the time of the sale, which in *Roseleaf* we found to be at once an indicator of market value and a significant factor in deterring overvaluation by the vendor, gives no clue to market value, since the sale contemplates radical improved and changed use of the property. Effective prevention of overvaluation in a sale of property for commercial development utilizing a subordination clause lies in forcing the purchaser-developer to make realistic assessments of the likelihood of the project's success and in inducing him to exert his highest efforts in carrying it out. We think this can be accomplished by placing the risk of failure upon the purchaser-developer where it in reality belongs, by permitting the sold-out junior lienor vendor to recover a deficiency judgment in an action on his promissory note. We are of the opinion that the purpose of preventing overvaluation in this context is best subserved by not applying section 580b.

Another facet of the difference between the sold-out junior lienor in the subordination clause context and the standard purchase money situation

deserves comment. In the subordination clause context, the amount of the construction loan is usually extremely large. This is illustrated by the case at bench where the subordination clause provided that the vendor would agree to subordinate for construction loans up to $2 million, and a loan of $408,000 was actually obtained. It is clear that the typical vendor in this context cannot possibly raise the astronomical sums needed to buy in at the senior sale and thereby protect his junior security interest. The only possible protection available to the vendor other than careful and sometimes fortuitous choice of purchasers, is to allow a deficiency judgment against the commercial developer.[8]

The second purpose delineated in *Roseleaf,* namely to prevent aggravation of a depression in land values by not burdening purchasers with loss of the property plus personal liability, has little applicability to a sold-out junior lienor in the subordination clause context. If section 580b is applied to prevent the deficiency judgment, then the subordinating sold-out junior lienor loses both the land and the purchase price. If section 580b is not applied then the purchaser is subjected to the same burden. Neither party has the land in this context; the sole question is who shall bear the cost of the unpaid portion of the purchase price.

We, therefore, conclude that when in the sale of real property for commercial development, the vendor pursuant to the agreement of sale, subordinates his purchase money lien to the lien securing the purchaser-developer's construction loan and thereafter, upon the default of the purchaser-developer, loses his security interest after sale or foreclosure under the senior lien, section 580b should not be applied to bar recovery by the junior vendor lienor of the unpaid balance of the purchase price of the property.[9]

---

[8]In 1963 the Legislature amended the pertinent portion of section 580b (additions by amendment are underscored). "No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given *to the vendor* to secure payment of the balance of the purchase price of real property, *or under a deed of trust, or mortgage, on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the* purchase price of such dwelling occupied, entirely or in part, by the purchaser."

In *Kistler* v. *Vasi, supra,* 71 Cal.2d 261, this court recognized that the Legislature by this amendment singled out commercial development purchasers for different treatment with respect to nonvendor purchase money lenders. It is consistent with the spirit of that amendment to treat the commercial development of property differently in determining the applicability of section 580b.

[9]In *Raub* v. *Lee* (1960) 181 Cal.App.2d 529 [5 Cal.Rptr. 444] the Court of Appeal applied section 580b under the authority of *Brown* v. *Jensen* to a sold-out junior lienor who had subordinated his senior security interest to a construction lender. This case was decided prior to *Roseleaf. Raub* v. *Lee,* to the extent that it

In the case at bench, cross-complainant sold her property to cross-defendants for commercial development, subordinated her purchase money deed of trust to the deed of trust given by the purchaser-developer to the Union Bank to secure a construction loan, and thereafter became a sold-out junior lienor upon the bank's foreclosure following cross-defendants' default. Therefore, section 580b should not be applied to bar cross-complainant's recovery from cross-defendants of the balance due on the promissory note and the judgment of the trial court should be upheld on this basis. In view of this conclusion we need not consider the other contentions raised by the parties.[10]

The judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., and Burke, J., concurred.

---

is inconsistent with the views expressed herein, is disapproved. However, we note that in *Raub* the purchaser did not purchase for the purpose of commercial development, but rather for the purpose of building a single residence for himself, obtained the construction loan and insisted upon subordination for that purpose. Therefore, the facts in *Raub* remove that case from the holding in the instant case, since there was no purchase for commercial development.

Our attention has been directed to two other cases, both subsequent to *Roseleaf,* where the Courts of Appeal have applied section 580b to bar recovery by a sold-out junior lienor vendor who had subordinated his security interest to a construction loan. (*Valinda Builders, Inc.* v. *Bissner* (1964) 230 Cal.App.2d 106 [40 Cal.Rptr. 735] and *Kincaid* v. *Gomez* (1969) 274 Cal.App.2d 839 [79 Cal.Rptr. 539].) However, in both cases the actions were not upon the promissory note, but upon guaranties of payment of the promissory note. The courts in both cases concluded that the guarantors were not legitimate guarantors within the meaning of *Roberts* v. *Graves* (1969) 269 Cal.App.2d 410 [75 Cal.Rptr. 130] and *Heckes* v. *Sapp, supra,* 229 Cal.App.2d 549, but were purchasers and, therefore, entitled to protection against a deficiency judgment under section 580b. However, neither opinion contains any language concerning the applicability of section 580b to the factual situation presented in the light of *Roseleaf.*

[10]The other contentions raised by the parties are predicated on the assumption that section 580b applies to the case at bench and involve interpretations of certain exceptions to the application of that section. Among these contentions are various arguments that the guaranties of the individual partners are true guaranties so as to bring them outside the operation of section 580b. (See fn. 4, *ante,* and accompanying text.) Since we have concluded that section 580b does not apply, we need not consider possible exceptions to its applicability.